UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHERRY CANNADY, as next friend
to Jane Doe,

     Plaintiff,

                                Case No.

v.

                                Hon.

ALEX KAZAL, in his individual           United States District Judge
capacity only, JOHN BRISH, in his
individual capacity only, DEVON         Hon.
BERNRITTER, in his individual           United States Magistrate Judge
capacity only, and OAKLAND
COUNTY, MICHIGAN,

     Defendants.

Megan A. Bonanni (P52079)
Kevin Carlson (P67704)
Beth Rivers (P33614)
Pitt McGehee Palmer Bonanni &Rivers
117 West Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800
mbonanni@pittlawpc.com
kcarlson@pittlawpc.com
brivers@pittlawpc.com

Dean Elliott (P60608)
Dean Elliott, PLC
201 E. 4th Street
Royal Oak, MI 48067
(248) 251-0001
dean@deanelliottplc.com

## **COMPLAINT AND JURY DEMAND**

## INTRODUCTION

Throughout the afternoon and evening of Friday, January 13, 2023, a family member and multiple Good Samaritans made several calls warning the Oakland County Sheriff's Office ("OCSO") that Monica Cannady was in the midst of a mental health crisis and that she and her three young children, Jane Doe (then age 10), Kyle Milton (age 9) and Malik Milton (age 3), were wandering the freezing streets of Pontiac draped only in bedsheets, and in imminent danger of severe injury or death. The OCSO knew that the family was vulnerable and in grave danger. Reacting with hostility, disgust, and blatant indifference to the welfare of this young family, the defendant Sheriff's Deputies took actions which exacerbated Monica Cannady's mental health crisis and placed her and her children in a heightened state of danger, directly resulting in her death, the death of two of her children, and the permanent injury to her surviving child, Jane Doe.

On January 13, 2024, at approximately 1:14 p.m., Oakland County Sheriff's Deputy Devon Bernritter was called to McClaren Hospital in Pontiac, Michigan for a wellness check where he confronted Monica Cannady. Although Monica exhibited objective signs of mental distress and impairment as communicated by hospital personnel, Deputy Bernritter refused to alert Child Protective Services, a social worker at the OSCO's Pontiac substation, or the crisis intervention team at the OCSO to the situation. Instead, Bernritter followed Monica and her children from his patrol

car. Deputy Bernritter later acknowledged that his actions exacerbated Monica's fragile mental state, in fact cementing her paranoid delusion and fear that the police were trying to kill her and the children.

By mid-afternoon, the OCSO had received confirmation from Monica Cannady's family that she was suffering a mental health crisis. Good Samaritan Chuck Johnson called 911 to report seeing Cannady at the intersection of Franklin Road and Rapid Street. Johnson told the police that Cannady appeared to be mentally impaired, with three minor children who were crying and clearly in imminent danger. Oakland County Sheriff's Deputy Alex Kazal was dispatched to the scene for a wellness check/search but refused to get out of his patrol car, instead intentionally misrepresenting to Johnson that this was "not a police matter" and that he could not search for Monica Cannady and her children because had been ordered to assist with a traffic stop in another location. Kazal sped off. In truth, Kazal had been dispatched to search for Monica and her children and he simply refused to do so.

After leaving the intersection of Franklin and Rapid, Kazal had a16-minute cell phone with an OCSO colleague/superior. This call was inadvertently recorded on Kazal's body cam. In this conversation, Kazal revealed his true feelings and motives for why he left Monica Cannady and her children without searching for them, as he had been ordered to do. In a vile rant characterized by racially charged language, Kazal expressed anger and disgust at having to look for Monica Cannady

and the children, whining that he wanted to do "real police work" instead of following up on the call to look for them. Kazal referred to the citizens of Pontiac, whom he took an oath to protect, as "those people…. dumb ass welfare check" and referred to Good Samaritan Chuck Johnson as a "ghetto politician." Kazal raged that the Cannady family was just "homeless being homeless" and concluded that there was no point in searching for them, only to put the children in "bullshit foster care and get raped." Kazal, in utter disregard for the safety of the family, made a conscious decision not to search for them, leaving the scene and telling his friend on the phone, "the kids will still be there and they will be just fine…people in Pontiac just don't die….. it's a CYA [cover your ass] because a dumb ass ghetto politician can't just leave well enough alone just because it is kind of cold out…I don't particularly care."

Consistent with this rock-hard indifference, Deputy Kazal chose not to perform a search and took off. An undeterred Chuck Johnson continued to make calls to 911, even as deputies sped past him and refused to stop. By 7:30 p.m., after successive calls to 911, Deputies begrudgingly showed up to perform cursory searches of the tents where Johnson had seen the family hours earlier. OCSO Deputy John Brish mocked Johnson, telling his fellow deputies that he made sure to flash his flashlight around to make it seem as if he was searching for the family. Despite Johnson's plea that the family must be in the area, Brish and the other deputies

refused to search the surrounding area, instead choosing to resume their routine patrol duties for the remainder of the evening.

On Saturday, January 14, 2023, Monica Cannady continued to lead her children roaming the freezing streets on foot, knocking on doors for help. The OCSO deputies did nothing, making no effort to locate Monica and the children.  On the evening of January 14, 2023, Monica instructed the children to sleep outside in a field because she believed the police were trying to kill them.  The field is located near the intersection of Franklin and Rapid, where OCSO deputies had been dispatched to find the family. On the morning of Sunday, January 15, 2023, Jane Doe (then age 10) woke up to find her mother and brothers Kyle Milton (age 9) and Malik Milton (age 3) dead from exposure.

This case has been brought to shine a light on the pure and unadulterated deliberate indifference and bias of the Defendant OCSO Deputies, whose actions exacerbated Monica Cannady's mental health crisis, and whose decision not to search for the family directly resulted in their deaths. As for Jane Doe, the shameful and illegal actions of the OCSO deputies directly resulted in the loss of her entire family, leaving a permanent, traumatic, and devastating wound.

## JURISDICTION AND VENUE

1.      This action arises under the United States Constitution and the laws of the United States, particularly the Fourteenth Amendment to the United States

Constitution and 42 U.S.C §§ 1983 and 1988, the Americans with Disabilities Act and under the statutes and common law of the State of Michigan, including the Michigan Constitution, the Elliott Larsen Civil Rights Act ("ELCRA"), and the Persons with Disabilities Civil Rights Act ("PWDCRA").

2.    This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4) and 42 U.S.C § 1983.

3.    This Court should exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because those claims arise out of the same facts as the federal claims and all claims are part of the same case or controversy.

4.    Venue is proper pursuant to 28 U.S.C. § 1391(d) because all facts alleged in this Complaint took place in Oakland County, Michigan, and the parties reside in the Eastern District of Michigan.

## **PARTIES**

5.    Plaintiff Cherry Cannady is the Great Aunt of Monica Cannady (age 35) and Great Aunt of Kyle Milton (age 9) and Malik Milton (age 3), who froze to death in a field in Pontiac, Michigan and were discovered on January 15, 2023. She brings this action in her capacity as the personal representative of her niece, Jane Doe, to redress the wrongful death of Jane Doe's mother and brothers. Plaintiff Cannady is not seeking damages for herself and proceeds here solely as the personal representative of Jane Doe.

6.     Jane Doe, currently 12 years-old, is the daughter of Monica Cannady and the sister of Kyle and Malik Milton.

7.     Plaintiffs reside in Oakland County, Michigan.

8.     Defendant Oakland County is a municipal corporation organized in Oakland County, Michigan, and is responsible for all acts of the Oakland County Sheriff's Office ("OCSO"). The OCSO is one of the largest sheriff's offices in the United States and the largest in Michigan. The OCSO's jurisdiction includes all of Oakland County which has a population of over 1.2 million people. The OCSO also provides services to 15 communities through law enforcement contracts.  Pursuant to one such contract,OCSO conducts all police operations for the City of Pontiac, Michigan, including maintaining the safety and security of citizens of Pontiac, Michigan.In 2011, the OSCO took over patrols in the City of Pontiac, a predominately Black city (49% African American population), after a state-appointed emergency manager rescinded the City's contract with its police union and eliminated the City's police department. The imposition of emergency management upon the City of Pontiac, and the related disbandment of the City's police department and other public offices, was widely criticized and challenged as racially discriminatory because it disproportionately impacted the political rights and public resources of Black residents and other people of color.

9.      Defendant Oakland County is sued pursuant to 42 U.S.C. § 1983 for its official polices, practices, and customs, which were the motivating force and cause-in-fact for the decision to ignore reports that Monica Cannady and her family, including Jane Doe, was in imminent danger, to refuse to search for Monica Cannady and her children, including Jane Doe, and to misrepresent that their disappearance was not a police matter and they did not have time to look for her.

10.     Defendant Deputy Alex Kazal is a citizen of the State of Michigan and at all relevant times was acting under the color of state law within the course and scope of his employment as Deputy of the Oakland County Sheriff. Kazal is being sued pursuant to 42 U.S.C. § 1983 in his individual capacity for actions taken under color of law and for gross negligence under state law.

11.     Defendant Deputy Devon Bernritter is a citizen of the State of Michigan and at all relevant times was acting under the color of state law within the course and scope of his employment as Deputy of the Oakland County Sheriff. Bernritter is being sued pursuant to 42 U.S.C. § 1983 in his individual capacity for actions taken under color of law and for gross negligence under state law.

12.     Defendant Deputy John Brisch is a citizen of the State of Michigan and at all relevant times was acting under color of state law within the course and scope of his employment as a Deputy of the Oakland County Sheriff. Brisch is sued

pursuant to 42 U.S.C. § 1983 in his individual capacity for actions taken under color of law and for gross negligence under state law.

## STATEMENT OF FACTS

13.   In the weeks prior to her death, family members observed and reported that 35-year-old Monica Cannady was experiencing symptoms of a psychological disability, including muttering to herself and trouble concentrating.

14.   By January 13, 2023, Monica was in the midst of a psychiatric break, characterized by hallucinations, delusions and paranoia.

15.   On Friday, January 13, 2023, Monica left the house with her three children, Jane Doe (then age 10), Kyle Milton (age 9) and Malik Milton (age 3).  The family was without coats, hats or gloves and were draped in bedsheets.

16.   The temperature that day ranged from 23 degrees Fahrenheit to 31 degrees Fahrenheit, wind speeds reached 25 mph through the day, the wind chill falling to 10 degrees Fahrenheit, and there was light snow throughout the day.

17.   On January 13, 2023, at 1:01pm, a Good Samaritan Marisol (last name unknown) placed a call to the Oakland County Sheriff's Office via 911, reporting that a family of four (Cannady and her children) was knocking on doors asking for help and wearing only bedsheets to protect them from the cold.

18.   Marisol reported that the mother looked young and there was a baby with them and that when she turned the family away, Monica proceeded to attempt

to break into a neighbor's house. Marisol requested that the OCSO perform a welfare check and provided the family's location.

19.    At approximately 1:10 pm, at Water St & Mill, a drone search was deployed, and the family was located near Water and Mill streets.

20.    At 1:11 pm, OCSO Deputy E. Sallens, from his patrol car, observed the family traveling on foot southbound from Mill Street in downtown Pontiac.

21.    At 12:59 pm, overhearing a call from dispatch, Defendant Bernritter proceeded to locate the family at McClaren Hospital, arriving at 1:14 p.m.

22.    According to McClaren's surveillance video, Monica entered McClaren Hospital at 1:09 pm and left at 1:20 pm, walking eastbound on Mill, leaving Defendant Bernritter with 6 minutes in which to locate the family and assess the situation.

23.    Defendant Bernritter's interaction with Monica Monica severely exacerbated her already precarious mental health status and plunged her into a paranoid delusion that the police were pursuing her and trying to kill her.

24.    Monica demonstrated multiple objective behaviors to Defendant Bernritter which would cause any reasonable officer to understand, and which did in fact cause Defendant Bernritter to understand, that she was having psychiatric issues, that she and her children were in imminent danger, and in need of immediate intervention and assistance:

a.    Per hospital staff, the minor children (ages 10, 9 and 3) were left unattended in the emergency room for hours that morning wearing bedsheets;

b.    Monica was wearing a mask and had the hood of her sweatshirt pulled around the remainder of her face so that only her eyes were visible;

c.    Monica stared blankly at Deputy Bernritter without answering questions for such a protracted period of time that he assumed that she did not speak English;

d.    When Deputy Bernritter inquired if Monica and the children were ok, Monica responded, "I don't know that;"

e.    Monica bizarrely suggested that either her 9- or 3-year-old sons had called 911, despite the fact that they had no phones in their possession and are very young;

f.    Monica claimed that she was at the ER of McClaren Hospital for her son's cardiac appointment, and she was waiting for a ride, but Deputy Bernritter knew that a 911 call was placed minutes earlier reporting that Monica was knocking on doors, trying to break into houses and asking for help;

g.    Monica claimed that she was at the ER of McClaren hospital for her son's cardiac appointment, and yet a hospital staff person informed Bernritter that the children had been in ER since the morning without any adults, the hospital does not provide pediatric cardiology services, and that Monica was not in possession of hospital paperwork consistent with an appointment;

h.    Monica claimed that she was at the ER of McClaren hospital for her son's cardiac appointment and yet during the conversation with Bernritter, she informed him that she came to the ER because her son was cold; and

i.    When Bernritter questioned whether there was a "larger problem" here, Monica quickly walked away from Bernritter while he was talking to a nurse.

25.     In a report drafted after their deaths, Defendant Bernritter baselessly stated that Monica provided a reasonable explanation for being at the hospital and further asserted that Monica was attempting to deceive him because she might have a warrant for her arrest or was a suspect in a crime and was forced to leave the scene.

26.     After leaving the hospital, Defendant Bernritter watched as the family walked south toward downtown Pontiac.

27.     At 1:25 pm, Deputy Porter observed the family walking down Perry to Water Street, to Woodward and then turning south towards Auburn. When Porter asked from the patrol car window where the family was headed, Monica increased her pace to get away with two of her children running to catch up with her.

28.     At 1:34 pm, the family cut across grass on the northeast corner of Woodward and Auburn, whereupon Defendant Bernritter activated his emergency lights and confronted Monica a second time and scolded her that she was "dancing on the line of child neglect." Monica denied that she would ever neglect her children.

29.     Monica increased her pace and cut east across the grass near the northeast corner of Woodward and Auburn.

30.     Acknowledging that his presence was agitating Monica but remaining within her sight, Defendant Bernritter parked on the south side of Auburn and watched as the family walked across Mill Street to a building on the east side of the street, north of Auburn.

31.     At 1:40 pm, the family continued to walk south on Auburn away from Deputy Bernritter while he watched.

32.     Defendant Bernritter acknowledged that his actions, including his decision to follow Monica and remain in her sight, had pushed Monica away from a place of safety for her and the kids.

33.     Despite this, Defendant Bernritter confronted Monica a third time, but she continued to demonstrate fear and anxiety interacting with him.

34.     Although Monica claimed that she was going to the home of a relative, Defendant Bernritter did not ensure the family's safe arrival there, choosing instead to leave the area and to allow her to walk away from his sight.

35.     After the family wandered off, Defendant Bernritter spoke with his commanding officer, Sergeant Law, to report that the family was gone and that he did not know their current location.

36.     Defendant Benritter had probable cause to know that Monica was suffering a serious medical disability, that she and her children were in imminent danger and unable to care for themselves, and that she was attempting to break into homes on Mill Street, but in a report written after the deaths, Bernritter misrepresented to Sergeant Law that other than the freezing weather, which presented a danger to the family's health and safety, there was no basis to detain Monica.

37.     Sergeant Law confirmed that there was no social worker assigned to the OCSO's Pontiac substation and that both members of the crisis intervention team were off duty.

38.     Defendant Bernritter continued patrol for the remainder of his shift.

39.     From 1:40 p.m. to approximately 3:30 pm, Monica and the children wandered the streets of Pontiac, ultimately arriving at Monica's mother Fay Alexander's home.

40.     Upon arrival at Alexander's home, Monica was in a state of panic, banging on the door, reporting to her mother that she was being followed by the police as she entered the home.

41.     Fay Alexander's friend, Anthony Grandberry, took Monica upstairs in an attempt to calm her, while Fay fed the children and called her sister, Pamela Robinson, to ask her to come to the house.

42.     Highly agitated, Monica reported that the police were following her, trying to kill her and that she suspected that they were bugging her phones and houses.

43.     Alexander and Grandberry begged Monica to leave the children at the house, but she refused, becoming increasingly agitated that the police were bugging Fay's house, ultimately leaving at approximately 4:30 p.m. with her children in tow.

44.    At 4:36 pm, Pamela Robinson, at the direction of Alexander and Grandberry, went to the Pontiac Station in person to report that her niece Monica and the children were missing.  Robinson met with Defendant John Brish, alerting him that Monica had a serious mental health disability (bi-polar disorder) and was having a breakdown.  She also sought advice about committal to a mental hospital. Ms. Robinson identified for the OCSO her niece's name, address, and the ages of the children.

45.    At 4:39 p.m. Good Samaritan Chuck Johnson, who had been tracking the family's movements from his car, called 911 to report seeing a family in trouble at the corner of Franklin and Rapid.

46.    Johnson reported that there was "something going on with this adult," and that the kids were freezing and crying. Johnson provided the family's location as walking into the paint company on foot southbound on Franklin past the Akzo Nobel paint shop. Johnson stated that he had eyes on the family from his white Ford Sedan.

47.    At 4:53 p.m., Johnson again called 911, explaining that he had previously called and had not yet seen any Sheriff's deputies responding.  Johnson elaborated that there were three kids on the street, not wearing coats or hats, who were in harm's way.  Johnson further explained that the family had an interaction with a security guard at the bank, who came away from the interaction with the

opinion that the mother was mentally impaired. He pleaded for police to get down there and see what could be done.  Finally, Johnson explained that the family had been in front of the paint company but now they were in the woods.

48.     At 4:57 pm, Johnson greeted responder Defendant Alex  Kazal at the intersection of Franklin and Rapid.

49.     As illustrated by dash cam footage, Kazal was highly agitated, telling Johnson that the family's welfare was not a police matter and there was nothing that he could do.  The conversation proceeded as follows:

> Officer Kazal– are you calling on this thing?
>
> Chuck Johnson – Yes.
>
> Officer Kazal – you understand that there is nothing we can do about that right.
>
> Chuck Johnson -There's got to be somebody who can do something about it.
>
> Officer Kazal– see I have a partner who is about to stop a guy who is wanted for about 5 violent felonies.  I need to go deal with that.
>
> Chuck Johnson - Oh you don't have time to deal with this.
>
> Officer Kazal – there is nothing we can do about this.
>
> Chuck Johnson - Ok well I will call somebody else…

50.     Defendant Kazal misrepresented to Johnson that there was nothing that he could do about the family's situation and that it was not a police matter.

51.     Defendant Kazal further misrepresented that he was sent to assist his partner with a traffic stop involving a person wanted for five felonies and that he was not able to stay.

52.     In truth, and unbeknownst to Johnson, at approximately 4:37 p.m. Kazal had been ordered by command to search for Monica and the children, an order which Kazal refused to carry out and actively concealed.

53.     Instead, in violation of OCSO policies and procedures, without alerting dispatch, Defendant Kazal decided to show up to a routine traffic stop which was already underway and fully completed by 5:16 pm, and did not involve someone wanted for five felonies.

54.     At 5:02 pm, Defendant Brish checked Monica's house but there was no answer.

55.     At 5:07 pm, Pamela Robinson called the station to reiterate that Monica may be bi-polar and needed mental health treatment. She further reported that Monica was not at her home.

56.     At approximately 5:14 p.m., Defendant Kazal's Sergeant ordered him to go back to the area of Franklin and Rapid to search for Monica and the children.

57.     From 5:14 p.m.-5:30 p.m., Defendant Kazal was on a cell phone call while in his patrol car with an unidentified male who appears to be associated with the OCSO.  Kazal unwittingly recorded his side of the conversation on his body cam.

58.     This shocking footage serves as an unfiltered window into Kazal's thinking and motivation and in particular his deliberate decision to lie to Johnson and refuse to search for the family.

59.     Defendant Kazal rages throughout the16-minute conversation, his words imbued with racially charged language, referring to the citizens of Pontiac whom he serves as "those people," and good Samaritan Chuck Johnson as a "ghetto politician," reflecting a racial bias and indifference towards Pontiac and the well-being of the people in the community that he was supposed to serve as a police officer, including Plaintiff and her family, because of their race.

60.     Through his obscenely hostile words and aggressive body language, it is clear that Defendant Kazal was indignant about being sent by dispatch to look for the family, falsely assuming that it was just "homeless being homeless" and ranting that Chuck Johnson was a "dumb ass" and "Pontiac shit head."

61.     Defendant Kazal raged about not being able to do "real police work" and suggested that a female Deputy should be tasked with these calls.

62.     Defendant Kazal exploded that "these people cannot mind their own business" and complained that his command was making him go back there to search

18

for Monica and the children to what end, so that the children could be placed in "bullshit foster care and get raped?"

63.    Defendant Kazal, indifferent and unhinged, repeatedly stated "fuck "these people" and dismissed the emergency because "the kids will still be there and they will be just fine…people in Pontiac just don't die….. it's a CYA because a dumb ass ghetto politician can't just leave well enough alone just because it is kind of cold out."

64.    Defendant Kazal summed up his point of view about searching for Monica and her minor children by announcing, "I don't particularly care."

65.    At 5:25 Kazal arrived at the intersection of Franklin and Rapid and announced to his friend that he didn't see any "mythical tents."

66.    According to police logs, Kazal arrived at 5:25 p.m. at the intersection of Franklin and Rapid and cleared the area by 5:37 p.m.

67.    Consistent with this indifference, Kazal did not perform a search for Monica, failed to bother to even locate the tent where she was reported to be, and took off in his squad car.

68.    Defendant Kazal's affirmative actions including refusing to carry out the search and his numerous misrepresentations including lying about being dispatched to assist a deputy with a traffic stop placed Monica Cannady and her children in grave danger.

69.     From 5:31 p.m. to 5:34 p.m., Deputies Kazal and Lennart briefly searched the tent area where Johnson observed the family one hour previously, at 4:35 p.m.

70.     During the search, Deputies referred to the areas as containing "POS ("piece of shit") houses."

71.     At 7:34 pm, at 571 Alton Ave, Johnson requested that a Deputy make contact with him and noted that he (Johnson) would be in a white sedan so that police could identify him upon arrival.

72.     At 7:41 p.m., OCSO dispatch assigned Deputy Kazal to respond to the area of Franklin and Rapid.  Kazal asked dispatch to assign someone else to the run.

73.     When dispatch asked Kazal what he was tied up with, Kazal responded that he was performing routine patrol duties.

74.     At 7:47 pm, Johnson called the Pontiac Sub Station to report that two Deputies just drove right past him.  Johnson was instructed to call 911 again.

75.     At 7:48 p.m., Johnson called 911 to report that he saw deputies drive by without stopping, that a welfare check was needed and that he would be waiting in a white sedan.

76.     At 7:56 pm, Deputies Ennis, Abed and Brish arrived at the intersection of Franklin and Rapid, with Johnson remarking that the deputies "must be pretty busy tonight," considering the several hour delay in deputies arriving at the scene.

77.     Johnson instructed Deputy Brish to back up his car, providing him the exact location of the family hours previously.

78.     Johnson made sure to clarify to Deputy Brish that there were three little kids in trouble, that there was something going on that was not right and that if they didn't believe him, they should go talk to the security guard at the paint company.

79.     Johnson further elaborated that the "three children were screaming, they are in trouble…I feel that."

80.     Johnson instructed deputies that he saw the family go into a tent hours earlier, and if they were not there then they were nearby.

81.     Deputy Brish privately acknowledged to his fellow deputies that the only reason he gave Johnson's call "the time of day" was because earlier in the day he was sent on a welfare check for a "bi-polar chick" who was supposed to be walking in the cold.

82.     Defendant Brish and the other deputies performed a cursory search of the tents, shining their lights without entering the tents or searching the vehicle within one tent, despite the fact that the car door appeared to be slightly ajar.

83.     The search was only performed to put on an appearance and to appease Good Samaritan Johnson, with Deputy Brish laughingly commenting to his fellow deputies that he "flashed my lights so it seems like we [performed a thorough search]."

21

84.     Body camera footage confirmed the freezing temperatures that night, with footsteps making distinct crunching noises as Brish and his fellow deputies commented about  the freezing temperatures and rubbed their hands together.

85.     Despite being instructed by Johnson that the family must be nearby, Brish and his fellow deputies failed to search the surrounding area.

86.     After 8:05 pm on Friday January 13, 2023, the OCSO took no further action to located the family.

87.     In sum, at this point in the timeline, the Defendant deputies – Kazal, Bernritter, and Brish, as well as the OCSO, knew that:

a.  Monica Cannady was a person with a severe psychiatric disability;

b.  Monica Cannady's three children, including Jane Doe, were dependent on Cannady for their safety and security;

c.  Cannady was actively endangering her minor children, including Jane Doe;

d.  Cannady's children, including Jane Doe, were not properly clothed or protected against the freezing cold;

e.  Cannady was trespassing and attempting to break and enter into other people's houses;

f.  Cannady was providing false statements to officers, including her false statements to Defendant Bernritter, which Defendant learned in real time

from eyewitnesses including hospital staff were false statements to a police officer made by Cannady; and

g. Cannady fled her interview with Defendant Bernritter.

88.    On January 14, 2023, Monica continued to wander the small area within downtown Pontiac, in the midst of a psychiatric break, stopping at homes in the neighborhood asking for help.

89.    On January 14, 2023, neither the Defendant Deputies nor the OCSO took action to locate the family.

90.    Throughout January 13-15, 2023, under the belief that the OCSO was continuing to search for Monica and the children, family members and family friends continued to knock on Monica's door, drive the neighborhood and stand watch near her home.

91.    On January 15, 2023 (Sunday) at 3:13:29 pm 10-year-old Jane Doe made her way to a home located at Branch and Lake Streets, south of Howard McNeill Street, and reported her mother and brothers were dead, pointing to a field across the street.

92.    The final resting place of Monica Cannady and Kyle and Malik Milton is very near the intersection of Franklin and Rapid where Chuck Johnson plead Deputies to search on January 13, 2023.

93. Upon information and belief, the OCSO does not train, or inadequately trains, its officers in how to deal with persons suffering from psychiatric or psychological problems.

94. Furthermore, OCSO has a widespread or longstanding custom and practice of not providing assistance to individuals suffering from psychiatric or psychological problems, which failures, together with its lack of, or inadequate, training amounts to deliberate indifference towards the constitutional rights of individuals suffering from psychiatric or psychological problems.

95. Upon information and belief, as part of their jobs, OCSO officers regularly interact with members of the community suffering from psychiatric or psychological problems.

96. Decedent Monica Cannady was a qualified individual with a recognized disability, including bipolar disorder.

**COUNT I**
**VIOLATION OF 14ᵀᴴ AMENDMENT**
**UNLAWFUL DISCRIMINATION**
**42 U.S.C. § 1983**
**PLAINTIFF VS. INDIVIDUAL DEFENDANT DEPUTIES**
**AND**
**PLAINTIFF VS. OAKLAND COUNTY BASED ON UNCONSTITUTIONAL POLICIES, CUSTOMS, AND PRACTICES (*MONELL* LIABILITY)**

97. Plaintiff incorporates by reference all the above allegations.

98. 42 U.S.C. § 1983 authorizes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any

person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory."

99.    The Fourteenth Amendment to the United States Constitution states, in part, that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. § 1.

100.    The Supreme Court has long recognized that "[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).

101.    The Equal Protection Clause "applies to the activities of police agencies, and protects persons from irrational discrimination in either acts of commission or omission." *Bartalone v. Berrien Cnty.*, 643 F. Supp. 574, 576 (W.D. Mich. 1986)(citing *Smith v. Ross*, 482 F.2d 33, 36–37 (6th Cir.1973)).

102.    It is thus clearly established and known to all reasonable police officers that the Equal Protection Clause requires police officers and agencies to enforce the laws equally and fairly and to fulfill their affirmative duty to protect persons within their jurisdiction without intentionally discriminating against them because of their race, disability, homelessness, or other irrational basis. *Id*.

103.   In other words, regardless of whether there is a general constitutional right to police protection, the police may not discriminate in "providing protection to members of the public." *Bartalone*, 643 F. Supp. at 576 (quoting *Lowers v. City of Streator*, 627 F.Supp. 244 (N.D.Ill.1985)).

104.   In this case, the defendants were notified and had actual knowledge of a situation involving Monica Cannady and her family in which they knew Monica was suffering a severe form of medical disability, that Monica and her children were in imminent danger and unable to protect themselves, that Monica was endangering her children, that she was either trespassing or attempting to break into houses as the family wandered around Pontiac on a freezing cold day that Monica was providing false statements to police officers, and that Monica had fled her interview with Defendant Bernritter.

105.   In light of this knowledge, the defendants had a duty to  provide the same level of protection to Plaintiff and her family that they would provide to residents of Oakland County outside of Pontiac, residents who are Caucasian, residents who were not suffering from mental disability, and residents, such as Plaintiff and her siblings, who were minor dependents of a parent suffering from severe mental disability.

106.   In violation of their duty, Defendants made a conscious decision to ignore calls, to not search for Plaintiff and her family, to not complete a welfare

check, and to abandon efforts to search for and protect Monica and her children before the suffered serious and fatal injuries due to the cold.

107.   These decisions were based on the disparate treatment of Black residents in Pontiac, a predominately Black community, in comparison with the more favorable treatment of residents in the predominately Caucasian communities of Oakland County surrounding Pontiac.

108.   In the alternative, Defendants discriminated against Plaintiff as a "class of one" because Plaintiff was intentionally treated differently than others similarly situated and there was no rational basis for the difference in treatment.

109.   Specifically, there was no conceivable basis for Deputy Kazal and the other individual defendants to deliberately ignore or refuse to respond to calls for service, to refuse to search for Monica and her children, to conduct a superficial search that was not intended, in good faith, to locate the family, and to abandon the search before the family was found.

110.   Furthermore, the decisions of Deputy Kazal and the other individual defendants was based on personal spite, animus and ill-will, unrelated to their official duties, towards Plaintiff and her family.

111. In 2011, the OSCO took over patrols in the City of Pontiac, a predominately Black city (49.6% African American population, compared to 13.3% African American in surrounding Oakland County), after a state-appointed

emergency manager rescinded the City's contract with its police union and eliminated the City's police department.

112.    The imposition of emergency management upon the City of Pontiac, and the related disbandment of the City's police department and other public offices, was widely criticized and challenged as racially discriminatory because it disproportionately impacted the political rights and public resources and services of Black residents and other people of color.

113.    The Oakland County Sheriff's Office maintains a policy, custom, and practice of permitting its deputies to use their discretion in initiating, continuing, and completing welfare checks and searches for persons in the City of Pontiac, such as Plaintiff and her family, even where there is clear evidence providing probable cause to conclude that they are in imminent danger of injury or death.

114.    As a result of this policy, custom, and practice, individual deputies such as Deputy Kazal make decisions on a day-to-day basis that are motivated by bias, including racial bias, and resulting indifference to the lives and safety of the residents of Pontiac, including Plaintiff and her family, because of their race.

115.    The individual deputy defendants did in fact act upon their bias and indifference towards Black residents of Pontiac, including Plaintiff and their family,

when they abused their discretion by refusing to search for and locate Plaintiff and her family as they wandered the streets of Pontiac in freezing weather.

116.   The individual deputy defendants did in fact act upon their bias and indifference towards residents of Pontiac who are poor, who are perceived to be homeless, who are suffering from psychiatric disabilities, or whom they deem to be less worthy of police protection because of these characteristics.

117.   The actions of the individual officers, and the policies, practices and customs of Oakland County, denied Plaintiff the full and equal enjoyment of public safety services in violation of the Equal Protection Clause of the Fourteenth Amendment.

### COUNT II
### VIOLATION OF ELLIOTT-LARSEN CIVIL RIGHTS ACT
### DENIAL OF FULL AND EQUAL ENJOYMENT OF
### PUBLIC SAFETY SERVICES BECAUSE OF RACE
### PLAINTIFF VS. ALL DEFENDANTS

118.   Plaintiff incorporates by reference all the above allegations.

119.   Under the Michigan Elliott-Larsen Civil Rights Act ("ELCRA") it is unlawful for the defendants to "[d]eny an individual the full and equal enjoyment

of…public service[s] because of…race, color [or] national origin." MCL 37.2302(A).

120. It is well-established in Michigan that policing services are considered a public service under the ELCRA. *Diamond v. Witherspoon,* 265 Mich. App. 673 (2005) at 686-87; *Gazette v. City of Pontiac*, 212 Mich. App. 162, 169 (1995).

121. In 2011, the OSCO took over patrols in the City of Pontiac, a predominately Black city (49.6% African American population, compared to 13.3% African American in surrounding Oakland County), after a state-appointed emergency manager rescinded the City's contract with its police union and eliminated the City's police department.

122. The imposition of emergency management upon the City of Pontiac, and the related disbandment of the City's police department and other public offices, was widely criticized and challenged as racially discriminatory because it disproportionately impacted the political rights and public resources and services of Black residents and other people of color.

123. The Oakland County Sheriff's Office maintains a policy, custom, and practice of permitting its deputies to use their discretion in initiating, continuing, and completing welfare checks and searches for persons such as Plaintiff and her family even where there is clear evidence providing probable cause to conclude that they are in imminent danger of injury or death.

124.   As a result of this policy, custom, and practice, individual deputies such as Deputy Kazal make decisions on a day-to-day basis that are motivated by bias, including racial bias, and resulting indifference to the lives and safety of the residents of Pontiac, including Plaintiff and her family, because of their race.

125.   The individual deputy defendants did in fact act upon their bias and indifference towards Black residents of Pontiac, including Plaintiff and their family, when they abused their discretion by refusing to search for and locate Plaintiff and her family as they wandered the streets of Pontiac in freezing weather.

126.   The actions of the individual officers, and the policies, practices and customs of Oakland County, denied Plaintiff the full and equal enjoyment of public safety services in violation of the Elliott-Larsen Civil Rights Act.

127.   The facts of this case, as alleged in this Complaint, establish that the Oakland County Sheriff's Office and its deputies, in exercising their discretion, consciously or through implicit bias, are willing to place the Black residents of Pontiac, including children and individuals with disabilities, in grave danger because of their indifference to their well-being.

128.   This culture of racial bias and hostility is established and evidenced in part by the recording of Deputy Kazal's phone conversation on January 13, 2023 which reveals a mindset influenced by unconscious or implicit biases, informed by racial stereotypes, and uninhibited by standard police policies and procedures,

resulting in policing decisions that do not value the safety, security, and well-being of the residents in Pontiac, an African-American majority community, the same way they value the lives of individuals elsewhere in Oakland County, which is predominately Caucasian.

129.   As a result of the denial of full and equal enjoyment of public safety services by the defendants, Plaintiff suffered extreme physical and emotional injury.

**COUNT III**
**GROSS NEGLIGENCE**
***Plaintiff Jane Doe v. Defendants Kazal, Brish, and Bernritter***

130.   Plaintiff incorporates by reference all the above allegations.

131.   "Defendants" as used in this Count means the individual OCSO deputies Kazal, Bernritter, and Brish.

132.   "Gross negligence" means a duty and breach of that duty by conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results, causing injury. MCL § 691.1407(2).

133.   Defendants had a duty to refrain from taking actions that were so reckless as to demonstrate a substantial lack of concern for whether an injury results, thereby causing injury.

134.   In deliberate breach of his duty, Defendants failed to intervene on any of the multiple occasions when doing so would have allowed Monica Cannady to

obtain the help that she needed, protect her children and prevent their deaths and and the resulting psychological harm to Jane Doe.

135.   In deliberate breach of their duty, Defendant Kazal refused to carry out orders and search for the family, placing them directly in harm's way.

136.   All of these breaches of duty were so reckless as to demonstrate a substantial lack of concern for whether an injury would result, and these breaches were the cause of the deaths of Monica Cannady, Kyle Milton and Malik Milton from hypothermia and the permanent injury to Jane Doe.

137.   When a citizen such as Monica Cannady is reported by family as suffering a psychological break and is observed by law enforcement wandering the streets with her minor children in bedsheets, endangering their safety, it is entirely foreseeable that disregarding their well-being and leaving them to wander in the freezing cold is extremely likely to result in injury, harm and death.

138.   Defendants breached their duty of care because, despite having adequate reason to know Monica Cannady was mentally struggling and that her children were vulnerable, that she presented a foreseeable risk of severe injury or death to her children, who were dependent on her for their safety and well-being.

139.   Defendants' actions—including and not limited to their inadequate and dangerous policies and practices, their affirmative decisions to refuse to search for the family, decision to exclude Child Protective Service and other intervention was

so reckless as to demonstrate a substantial lack of concern for whether an injury resulted, and therefore breached their duty of care.

140.   Defendants' acts and omissions were grossly negligent, and were the proximate cause of the death of Monica Cannady, Kyle Milton and Malik Milton and the permanent injury to Jane Doe because Defendants' acts and omissions directly placed the family in harm's way, caused Monica Cannady's mental illness to escalate, specifically her belief that she was being followed by law enforcement and was not safe at home.

141.   As a direct and proximate result of Defendants' actions Jane Doe suffered permanent injury and damages as alleged above.

**COUNT IV**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
**AND THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH**
**AMENDMENT**
**DISABILITY DISCRIMINATION**
**PLAINTIFF VS. ALL DEFENDANTS**

142.   Plaintiff incorporates by reference all the above allegations.

143.   Title II of the Americans With Disabilities Act (ADA) protects individuals with mental health disabilities from discrimination by police officers and police agencies.

144.   Title II of the ADA provides that no qualified individual with a disability shall, because of that disability, be excluded from participation in, denied

the benefits of, or subjected to discrimination in the services, programs, and activities of all state or local government entities, including law enforcement.

145.   Such services, programs, and activities includes law enforcement street interactions, taking and responding to complaints or calls for assistance, vehicle stops and searches, arrests, detentions, interviews, interrogations, and emergency responses

146.   The non-discrimination requirements of the ADA protect individuals with disabilities, such as Monica Cannady, as well as persons who are associated with a person with a disability, such as Plaintiff and her siblings, who were Cannady's minor children.

147.   The ADA requires that police officers and police agencies provide individuals with disabilities, and persons associated with them, the equal opportunity to benefit from safe, inclusive communities and public services, including police and public safety services.

148.   The ADA also requires local governments and officers to avoid discriminating against people with mental health disabilities, and against those associated with them, in administering services.

149.   In conscious and willful violation of their duties under the ADA, Defendants discriminated against Monica Cannady as well as against Plaintiff, as a

minor child closely associated with Cannady, by depriving them of equal police and public safety services because of disability.

150.   This claim is brought directly under the ADA and under the Equal Protection Clause pursuant to 42 U.S.C. § 1983. *Bullington v. Bedford County, Tennessee*, 905 F.3d 467 (2018).

**COUNT V**
***Violation of Michigan Persons with Disabilities Civil Rights Act***
***(Disability Discrimination)*** *– As to all Defendants*

151.   The allegations set forth above are re-alleged and incorporated herein by reference.

152.   Like its federal counterpart in the ADA, the Michigan Persons with Disabilities Civil Rights Act protects individuals with mental health disabilities from discrimination by police officers and police agencies because of their disability as well as their association with or dependence on a person with a disability.

153.   The PWDCRA specifically guarantees the opportunity obtain full and equal utilization of "public services" without discrimination because of a disability and requires a person to accommodate a person with disabilities for purposes of public services unless accommodation would impose an undue hardship. Mich. Comp. Laws § 37.1102(1), (2).

154.   A county and a police department are "public services" under the PWDCRA. Gazette v. City of Pontiac, 212 Mich.App. 162, 536 N.W.2d 854, 858

(1995) (noting that a police department is a public service under the HCRA, the predecessor to the PWDCRA).

155.    The non-discrimination requirements of the PWDCRA protect individuals with disabilities, such as Monica Cannady, as well as persons who are associated with a person with a disability, such as Jane Doe and her siblings, who were Cannady's minor children.

156.    The PWDCRA requires that police officers and police agencies provide individuals with disabilities, and persons associated with them, the equal opportunity to benefit from safe, inclusive communities and public services, including police and public safety services.

157.    The Act also requires local governments and officers to avoid discriminating against people with mental health disabilities, and against those associated with them, in administering services.

158.    In conscious and willful violation of their duties under the Act, Defendants discriminated against Monica Cannady as well as against Plaintiff, as a minor child closely associated with Cannady, by depriving them of equal police and public safety services because of disability.

## COUNT VI
### Negligent Infliction of Emotional Distress
### *As to Defendants Kazal, Brish, and Bernritter*

159.   Plaintiff incorporates all other allegations in this Complaint by reference.

160.   The individual defendants owed a duty of care to Plaintiff because Plaintiff was a minor child in the custody of her mother, Defendants were police officers who had knowledge of the mother's severe medical disability, and knowledge and reasonable cause to know that the situation placed Plaintiff and her siblings in imminent danger of severe injury or death.

161.   In breach of their duty of care, Defendants consciously refused to answer calls for service and consciously refused to undertake or complete a search for Plaintiff and her family, and consciously decided to leave Plaintiff and her family to the risks and dangers of wandering outside in the freezing cold.

162.   As a direct result of Defendants' breach of duty, Plaintiff's mother and siblings suffered serious injury and died in Plaintiff's presence, which caused Plaintiff severe mental disturbance and shock from witnessing the events that resulted in Plaintiff's own physical harm.

163.   Plaintiff was the daughter of one injured person (Monica Cannady) and the sister of two other injured persons.

164.   Plaintiff was present  at the location where her mother and siblings died and experienced shock fairly contemporaneously with their injuries and death.

## COUNT VII
### VIOLATION OF MICHIGAN'S CHILD PROTECTION LAW, MCL 722.621 ET SEQ.
### Jane Doe vs. Kazal, Brish, and Bernritter

165.   Plaintiff incorporates by reference all the above allegations.

166.   Section 2 of Michigan's Child Protection Law, MCL 722.621, *et seq*. mandates that every person engaged in a particular occupation, "who has reasonable cause to suspect child abuse or child neglect shall make an immediate report…of the suspected child abuse or child neglect" to the Department of Health and Human Services. MCL 722.623(3)(a). The list of professions subject to his mandatory reporting requirement is extensive and includes any "law enforcement officer[.]" *Id*.

167.   Section 13 of the Child Protection Law, MCL 722.633, provides for a private right of action in damages resulting from a failure to report child abuse or neglect: "A person who is required by this act to report an instance of suspected child abuse or neglect and who fails to do so is criminally liable for the damages proximately caused by the failure." MCL 722.633(1).

168.   Defendants Kazal, Bernritter, and Brish are and were at all times relevant to this action mandatory reporters under MCL 722.623(1)(a).

169.   Defendants Kazal, Bernritter, and Brish all had sufficient information to give them reasonable cause to suspect that Doe was being abused and/or neglected by her mother, Monica Cannady.

170.   Defendants Kazal, Bernritter, and Brish had specific experience as police officers to know that Doe and her siblings faced an imminent risk of further serious injury and death as a result of their mother's abuse and neglect, because under the direction of their mother they were being led around Pontiac in the freezing cold, wearing clothing and covered in bed sheets that could not safely protect them from the cold, while their mother, whom Defendants knew was mentally disabled and acting erratically, attempted to break and enter various properties in violation of the law.

171.   All of the information known to Defendants Kazal, Bernritter, and Brish was sufficient to cause them to know that Doe was a victim of child abuse or neglect and that the immediate intervention by CPS and/or law enforcement was required to protect Doe and her siblings from further serious injury and death.

172.   The affirmative decision of Defendants Kazal, Bernritter, and Brish not to contact CPS, even after learning of Doe's erratic behavior and her refusal to provide truthful information to Bernritter when he spoke with her at the hospital, was reckless and grossly negligent based on their unambiguous mandatory duty to report pursuant to Michigan's Child Protection Law, and these actions were the proximate cause of Doe's injuries as alleged above.

173.    Under MCL 722.633(1), a mandatory reporter who fails to report suspected child abuse or neglect is "civilly liable for the damages proximately caused by the failure."

174.    The failure to report by Defendants Kazal, Bernritter, and Brish proximately caused the injuries and damages suffered by Plaintiff Doe.

175.    Governmental immunity under MCL 691.1407(2) does not apply to this claim because the proximate cause language of the Child Protection Law is controlling. Furthermore, governmental immunity does not apply because the affirmative decisions of Defendants Kazal, Bernritter, and Brish amounted to gross negligence that was the direct and proximate cause of the injuries and damages sustained by Plaintiff.As the direct and proximate result of the above-described conduct of Defendants, Plaintiff has suffered, continues to suffer and will suffer in the future from serious injuries and damages, including but not limited to:

    a.  Conscious pain and suffering.

    b.  Permanent scarring.

    c.  Fright, shock and terror.

    d.  Depression and anxiety.

    e.  Emotional distress.

    f.  Mental anguish

    g.  Loss of future earning capacity.

41

h.  Significant humiliation and embarrassment.

i.  Medical bills.

j.  Out-of-pocket expenses.

k.  Other economic and non-economic damages which are ongoing and will be permanent.

## RELIEF REQUESTED

176.  Accordingly, Plaintiffs respectfully request this Honorable Court grant the following relief in accordance with 42 U.S.C. § 1983, MCL § 722.621, and Michigan common law:

(a)  An award of actual and punitive or exemplary damages recoverable under Michigan's Wrongful Death Statute;

(b)  An award of damages as the court or jury shall consider fair and equitable, under all the circumstances including reasonable medical, hospital, funeral, and burial expenses for which the estate is liable; reasonable compensation for the physical and emotional pain and suffering, while conscious, undergone by Plaintiffs during the period intervening between the time of the injury and death;

(c)  An award of damages for the loss of the society and companionship of the deceased;

(d)  An award of actual attorney fees and costs; and

(e)    Any further legal and/or relief that the Court and/or Jury deems

equitable or just.

By: */s/ Megan A. Bonanni*
Megan A. Bonanni (P52079)
Kevin Carlson (P67704)
Beth Rivers (P33614)
Pitt McGehee Palmer Bonanni &Rivers
117 West Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800
mbonanni@pittlawpc.com
kcarlson@pittlawpc.com
brivers@pittlawpc.com

Dean Elliott (P-60608)
Dean Elliott, PLC
201 E. 4th Street
Royal Oak, MI 48067
(248) 251-0001
dean@deanelliottplc.com

Dated: March 7, 2025

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHERRY CANNADY, as next friend
to Jane Doe,

    Plaintiff,

                           Case No.

v.

                           Hon.

ALEX KAZAL, in his individual     United States District Judge
capacity only, JOHN BRISH, in his
individual capacity only, DEVON    Hon.
BERNRITTER, in his individual     United States Magistrate Judge
capacity only, and OAKLAND
COUNTY, MICHIGAN,

    Defendants.

---

## DEMAND FOR JURY TRIAL

Plaintiff, through their attorneys, Pitt McGehee Palmer Bonanni & Rivers,

P.C., hereby demand a trial by jury of all issues in the within cause of action.

By: */s/ Megan A. Bonanni*
Megan A. Bonanni (P52079)
Kevin Carlson (P67704)
Beth Rivers (P33614)
Pitt McGehee Palmer Bonanni &Rivers
117 West Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800
mbonanni@pittlawpc.com
kcarlson@pittlawpc.com
brivers@pittlawpc.com

Dean Elliott (P-60608)
Dean Elliott, PLC
201 E. 4th Street
Royal Oak, MI 48067
(248) 251-0001
dean@deanelliottplc.com

Dated: March 7, 2025